**The FIDELITY BANK**

**v.**

**COMMONWEALTH MARINE AND GENERAL ASSURANCE COMPANY, LTD; J.E. Mamiye & Sons, Inc.; Maurice L. Jackson; Floyd Fountain and Farmers State Bank of Center, Texas; George K. Lynch; Horizon Medical Administrators, Inc.; G.A. Brown; Pak-Mor Manufacturing Company; Delan Townson and First Alabama Bank of Conecuh County; Phillips & Sons, Inc.; Hutchinson Financial Corporation of Alabama; Neb, Ltd.; Anne and Art Johnston d/b/a Treasure Harbor Sailing Yachts; and Reid, Inc.**

**Civ. A. No. 83–2071.**

United States District Court, E.D. Pennsylvania.

Feb. 24, 1984.

Joan A. Yue, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for The Fidelity Bank.

Gordon Gelfond, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., for Commonwealth Marine & General Assur. Co., Ltd.

Miles H. Shore, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for J.E. Mamiye & Sons, Inc.

Eileen P. Epley, Philadelphia, Pa., for Maurice L. Jackson.

T.R. McLeroy, Jr., Center, Tex., for Floyd Fountain and Farmers State Bank of Center, Texas.

Glenn E. Woodard, El Paso, Tex., for George K. Lynch.

Stephen D. Ivey, Philadelphia, Pa., for G.A. Brown.

Joseph H. Reiter, Stephen M. Chiles, Stassen, Kostos & Mason, P.C., Philadelphia, Pa., for Pak-Mor Mfg. Co.

William J. Barker, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Delan Townson d/b/a Townson Trucking Co., and First Alabama Bank of Conecuh County.

Brenda Smith Statum, Merrill, Porch, Doster & Dillon, Anniston, Ala., for Hutchinson Financial Corp. of Alabama.

John C. Sullivan, Lennon C. Wright, Houston, Tex., John C. Sullivan, Frumkin & Manta, Philadelphia, Pa., for Phillips and Son, Inc.

Maurice J. Maley, Jr., Krusen, Evans & Byrne, Philadelphia, Pa., for Anne & Art Johnston, d/b/a Treasure Harbor Sailing Yachts.

William J. Cattie, III, Heckler & Cattie, Wilmington, Del., for NEB, Ltd.

Neal L. Conner, Jr., Kopp, Peavy & Conner, P.C., Waycross, Ga., for Reid, Inc.

Arnold P. Borish, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for Horizon Medical Administrators, Inc.

## OPINION

LOUIS H. POLLAK, District Judge.

CONTENTS — Page

I. INTRODUCTION 1002
II. FACTUAL BACKGROUND 1003
(A) The Trust Agreement 1004
(B) Pennsylvania Attachment 1005
(C) Defendants' Claims 1005
(1) J. E. Mamiye & Sons, Inc. 1005
(2) Horizon Medical Administrators 1006
(3) George K. Lynch 1006
(4) G. A. Brown 1007
(5) Maurice L. Jackson 1007
(6) Floyd Fountain and Farmers State Bank of Center, Texas 1007
(7) Pak-Mor Manufacturing Company 1008
(8) Delan Townson and First Alabama Bank of Conecuh County 1008
(9) Phillips & Sons, Inc. 1008
(10) Hutchinson Financial Corporation of Alabama 1008

CONTENTS Page

(11) NEB, Ltd. 1009
(12) Anne and Art Johnston d/b/a Treasure Harbor Sailing Yachts 1009
(13) Reid, Inc. 1009
(D) Chronology 1009
III. LEGAL ANALYSIS 1011
(A) Law Applicable to this Action 1011
(B) Perfection of a Claim by Attachment 1011
(1) Validity of Horizon, Brown, and Pak-Mor Attachments 1013
(2) Validity of Mamiye's Attachment 1013
(a) Attachability of Interpleaded Fund by Mamiye as General Creditor of Commonwealth 1013
(b) Effect of Challenge to Mamiye's Judgment 1016
(C) Perfection of a Claim Under the Trust Agreement 1017
(D) Priority of Claims 1018
(E) Amounts of Claims Recoverable from the Fund 1020
IV. CONCLUSION 1022

## I. INTRODUCTION

Commonwealth Marine and General Assurance Company, Ltd. ("Commonwealth") is an insurance company incorporated in Belize, Central America. Commonwealth sold insurance policies in the United States for some period prior to the commencement of this action. As security for its customers in the United States, Commonwealth established a Trust Fund on deposit with plaintiff, The Fidelity Bank ("Fidelity"), by a Trust Agreement entered into on January 19, 1979 and attached to this Opinion as an appendix. Commonwealth initially deposited approximately five hundred thousand dollars ($500,000) in the Trust Fund.

At some point prior to the commencement of this action, Commonwealth ceased paying on some or all of its insurance policies. Several of Commonwealth's creditors sought to perfect claims to the Trust Fund either under the Trust Agreement's terms or through Pennsylvania's attachment process. On April 29, 1983, Fidelity filed a complaint in interpleader initiating this action. Fidelity paid into this court's registry a sum of $440,891.61. On May 23 I ordered that the clerk place this fund into thirteen-week Treasury Bills and other interest-bearing accounts; the fund therefore now exceeds the initial $441,000.[1]

In addition to Commonwealth, Fidelity listed eleven claimants to the money paid into court in the initial complaint. On June 28, I gave Fidelity leave to amend its complaint to add four additional claimants. These fifteen claimants, however, only assert twelve separate claims on the funds in court. In addition to these twelve claims, a further claimant, Reid, Inc., moved to intervene on August 29. The court thus has before it thirteen claims upon the interpleaded fund. The court has received correspondence (all filed of record) suggesting that outside the contours of this litigation there are a number of other disappointed Commonwealth customers.

All of the claimants have filed statements of claim with this court. In lieu of having each claimant file an answer to all the others' statements of claim, on August 1 I ordered the parties to file motions for summary judgment, if they so desired, by August 29. Eight of the twelve claimants and Reid, Inc., moved for summary judgment by August 29. Two claimants, NEB, Ltd. and Hutchison Financial Corp. of Alabama, missed the August 29 deadline, but moved for summary judgment in any event. George K. Lynch, Floyd Fountain and The Farmers State Bank of Center, Texas have neither moved for summary judgment nor responded to the other parties' motions.

In addition to its response to the other motions for summary judgment, claimant

1. This case involves two overlapping "funds." As I discuss below, Commonwealth retained an income interest in the Trust. Trust Agreement, art. II, ¶ 8. Any income, then, did not become part of the Trust Fund. Fidelity may, however, have paid some of the income into court as part of the interpleaded fund. Further, some of the interpleaded fund still impressed with Commonwealth's Trust has earned income not subject to the Trust since its payment into court. To distinguish these two funds, I will capitalize references to the Trust Fund, by which I mean those assets impressed with Commonwealth's Trust, and I will not capitalize fund when I mean to refer to the entire amount paid into court.

G.A. Brown moved to strike the pleadings and affidavits of several parties on a variety of grounds.

On December 2, I heard oral argument on the pending motions: Reid, Inc.'s motion to intervene, Brown's motions to strike, and the motions for summary judgment. At the argument I granted Reid's motion to intervene and denied Brown's motions to strike. I did add, however, that with regard to those parties whose pleadings Brown had moved to strike for lack of compliance with Local Rule 13, I would strike no pleadings or affidavits, but I would require all counsel other than William Cattie, Esq., a member of this court's bar from Wilmington, to associate themselves with local counsel so as to comply with Rule 13.[2]

Two issues arose at oral argument. First, Pak-Mor Manufacturing Company attacked the validity of J.E. Mamiye & Sons, Inc.'s New York judgment against Commonwealth. Pak-Mor has moved to intervene in the New York proceedings. I asked counsel for Pak-Mor to keep me abreast of developments in the New York suit. Second, some claimants have requested the court to award post-judgment interest out of the interpleaded fund. I asked counsel for further briefing on the propriety of such an award. Counsel have responded to both my requests. As part of its response, Pak-Mor has requested leave to submit an affidavit of Joseph Reiter, Esq., which I now grant. The motions for summary judgment are ripe for disposition, as the parties dispute few material facts. Where unresolved fact issues have appeared, I note them below.

## II. FACTUAL BACKGROUND

The claimants have attempted to perfect claims on the Trust Fund in three ways. First, some claimants have complied with the terms of the Trust Agreement. Second, some claimants have attempted to attach the assets of the Fund under the Pennsylvania procedure. Third, some

2. When he wishes to appear in a particular case, Rule 13(a) requires an attorney not admitted to practice before this court or an attorney who does not maintain an office in Pennsylvania to associate himself with an attorney who is both admitted and has an office in this state. E.D.Pa. R.Civ.P. 13(a). Rule 13(b) requires leave of court before an attorney not admitted to this court may "actively participate in the conduct of any trial or of any pretrial or post-trial proceeding, before this court ...." E.D.Pa.R.Civ.P. 13(a). Rule 13(b) requires leave of court before an attorney not admitted to this court may "actively participate in the conduct of any trial or of any pretrial or post-trial proceeding, before this court ...." E.D.Pa.R.Civ.P. 13(b).

Our Court of Appeals has affirmed a district court's power to restrict admission to practice before that district court. *In re Roberts,* 682 F.2d 105 (3d Cir.1982) (upholding application of D.N.J.R.Civ.P. 4 which precludes appearances in that district court by attorneys not admitted to practice before the New Jersey state courts). While Rule 13 appears to make association with local counsel mandatory, the rule does not mention a sanction for failure to associate. In *Delaware Valley Factors, Inc. v. Coma Export, Inc.,* 534 F.Supp. 552 (E.D.Pa.1982), Judge Giles eschewed the draconian remedy suggested by Brown's motion, and so have I. Like Judge Giles, I prefer to order association with local counsel in the future, rather than punishing parties for past violation of Rule 13.

NEB, Ltd.'s counsel, William Cattie, presents a situation different from that of other out-of-state counsel. Mr. Cattie is admitted to practice before this court, but does not maintain an office in Pennsylvania; he does maintain an office in Wilmington, Delaware, less than an hour's drive away. Mr. Cattie has argued that application of Rule 13 in his situation is inappropriate and perhaps unconstitutional. Our Court of Appeals has adverted to the possibility that the parallel Local Rule 18(b), which requires a *pro se* litigant to maintain a mailing address within the Eastern District of Pennsylvania, may be invalid. *Levy v. Weissman,* 671 F.2d 766 (3d Cir.1982).

I have decided that all of the purposes of Local Rule 13 are served without requiring Mr. Cattie to associate with local counsel. By requiring counsel's admission to this court's bar, Rule 13 seeks to ensure that counsel is familiar with the procedure in this court. Mr. Cattie is so admitted. By requiring counsel to maintain an office in Pennsylvania, Rule 13 also seeks to ensure that counsel can communicate easily with one another and with the court. Mr. Cattie maintains an office in Wilmington, much closer than most of Pennsylvania, so both the other attorneys and the court can easily communicate with him. I therefore did not apply my ruling to Mr. Cattie.

claimants have merely filed a statement of claim in this suit without completely satisfying either the requirements of the Trust Agreement or the Pennsylvania rules.

In order to explicate the disputes in this case, I first outline the procedures under the Trust Agreement and the attachment procedures under the Pennsylvania Rules of Civil Procedure which certain claimants assert apply here. I then detail the claims of each claimant and the extent to which each claimant has satisfied either set of procedures. With these factual matters in mind, I proceed to consider the legal issues involved in these motions for summary judgment.

(A) *The Trust Agreement*

The first paragraph of article II of the Trust Agreement provides that "[t]he Trust Fund shall be exclusively available, but only as in this Agreement specifically provided, for the payment of claims under American policies" and for payment of expenses of the trustee. The second paragraph of article II defines the process by which a claimant can obtain payment from the Fund:

> A claim against the Company under an American policy issued subsequent to the execution of this trust agreement shall be enforceable by the policy-holder against the Trust Fund when all of the following four conditions have been complied with and not otherwise.
>
> (A) A judgment has been obtained by the policy-holder against the Company in any Court of competent jurisdiction within the United States of America in respect of the Company's liability under an American policy;
>
> (B) Such judgment has become final in the sense that the particular litigation has been concluded either through the failure to appeal within the time permitted therefore or through the final disposition of any appeal or appeals that may be taken, the word "Appeal" being used herein to include any similar procedure for review permitted by the applicable law;
>
> (C) A certified copy of the said judgment has been filed with the Trustee, together with such proof as to its finality and its conformance with the other conditions specified in this Article II as the Trustee shall require;
>
> (D) A period of thirty (30) days from the date of the filing with the Trustee of the said certified copy of the said judgment and all of said proofs has expired, without such judgment having been satisfied, provided, however, that the expiration of such thirty-day period shall not be required in the event the same extends beyond the termination date of the Trust;
>
> WHEREUPON the said judgment shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hands, without regard to the rights of any other policyholder or policyholders, provided that the Company at its option may waive any or all of the foregoing conditions mentioned in Subdivisions (A), (B), (C), and (D) hereof and direct the Trustee in writing to pay from the Trust Fund the claim of any policyholder against the Company under an American policy without such claim having become enforceable as above defined, whereupon the said claim shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hands without regard to the rights of any other policyholder or policyholders and provided further that the Trustee shall be absolutely protected in acting upon any such written direction from the Company without investigation and shall be under no obligation to see to the application of any such payment and shall not be concerned to ascertain or inquire as to the validity of such claim or the propriety of such direction.

Under the Trust Agreement, then, only a holder of an "American policy" can ever obtain satisfaction from the Fund. Unless Commonwealth directed Fidelity otherwise, the policyholder would have to (a) obtain a judgment in the United States; (b) survive all appeals of that judgment; (c) file proof of the judgment and its finality with Fidelity; and (d) wait thirty days. As an alterna-

tive, a claimant under an American policy may obtain a direction from Commonwealth to Fidelity that Fidelity should pay the claimant without regard to the four conditions.

The Trust Agreement defines "American policy" to mean "any contract or policy of insurance or reinsurance issued or any agreement to insure made by [Commonwealth] wherein the premiums and losses are expressed to be payable in U.S.A. currency." Trust Agreement, art. I, ¶ 2. The next paragraph defines "policyholders" as holders of American policies. Further, " 'claim' means a claim against [Commonwealth] by a policyholder for a loss under an American policy." Id., ¶ 4.

(B) *Pennsylvania Attachment*

Rules 3101–3149 of the Pennsylvania Rules of Civil Procedure govern enforcement of judgments for the payment of money in Pennsylvania. A judgment creditor must enter his judgment in a Pennsylvania court. *See* Pa.R.Civ.P. 3101(a) (Purdon 1975) (defining "judgment"). The judgment creditor may then obtain a writ of execution from the prothonotary of the county in which the judgment has been entered upon a praecipe filed by plaintiff. Pa.R.Civ.P. 3102–3104 (Purdon 1975). The prothonotary issues the writ to a sheriff who, in the case of intangible personal property, serves the writ upon a garnishee. Pa.R.Civ.P. 3108(a)(4) (Purdon Supp.1982).

> Service of the writ upon the garnishee shall attach all property of the defendant which may be attached under these rules which is in the possession of the garnishee. It shall also attach all property of the defendant which may be attached under these rules and which comes into the garnishee's possession thereafter until judgment against him even though no such property of the defendant was in his possession at the time of service.

Pa.R.Civ.P. 3111(b) (Purdon 1975).

Along with the writ served by the sheriff, the plaintiff may serve interrogatories upon the garnishee requesting specific information concerning any property or transaction involving the garnishee. Pa.R.Civ.P. 3144(a) (Purdon 1975). The garnishee answers the interrogatories as if they were a complaint. Pa.R.Civ.P. 3145 (Purdon 1975). In the event of a default, the prothonotary issues a judgment against the garnishee. Pa.R.Civ.P. 3146 (Purdon Supp.1982). If the garnishee presses the matter to trial, a court may enter a judgment against the garnishee for any property of the defendant in the garnishee's hands. Pa.R.Civ.P. 3147, 3148 (Purdon 1975 and Supp.1982). The garnishee, however, need not defend the action if he gives notice to the defendant of the writ or interrogatories. Pa.R.Civ.P. 3140, 3141 (Purdon 1975).

(C) *Defendants' Claims*

Twelve defendants have filed statements of claim in this action. I describe here the nature of the claims and the steps that each defendant has taken to perfect its claim under either the Trust Agreement or the Pennsylvania Rules of Civil Procedure.

(1) *J.E. Mamiye & Sons, Inc. ("Mamiye")*

Mamiye obtained a New York judgment upon a surety bond where Commonwealth was the surety. *J.E. Mamiye & Sons, Inc. v. Commonwealth Marine & General Assurance Co., Ltd.,* judgment entered at Index No. 11909/82 (N.Y.Sup.Ct., N.Y. County, May 24, 1982).[3] Mamiye entered this judgment in the Court of Common Pleas in the amount of $177,654.45. *J.E. Mamiye & Sons, Inc. v. Commonwealth Marine & General Assurance Co., Ltd.,* No. 6566, May Term (Pa.C.P., Phila. County, May 28, 1982). Mamiye then attempted to attach the property of Commonwealth in Fidelity's hands by writ of execution served along with interrogatories, on Fidel-

3. A copy of Mamiye's judgment was not included in the record of this case until it appeared as an Exhibit to Pak-Mor Manufacturing Company's December 7, 1983 Supplemental Memorandum.

ity on May 28, 1982. Fidelity's initial response to Mamiye's interrogatories only disclosed the existence of two Commonwealth checking accounts with a combined balance of $31,147. Commonwealth filed a bond in the amount of $31,147 to release these accounts. On June 24, 1982, Fidelity filed amended answers to Mamiye's interrogatories disclosing the existence of the Trust Fund. Mamiye asserts a claim to that Fund in the amount of its judgment ($177,654.45) plus 6 percent annual simple interest[4] from May 28, 1982 ($29.20 per day) less the $31,147 bond, or $159,831.53 as of August 29, 1983.

Commonwealth and Pak-Mor have moved to attack the New York judgment in New York. On June 22, 1983, before Fidelity instituted this federal suit, Judge Gafni had stayed Pennsylvania proceedings on the transferred judgment until resolution of the New York challenge. More importantly, Mamiye conceded at oral argument that its judgment is not a "claim" within the meaning of the Trust Agreement because the surety bond was not an "American policy" within the Agreement's definition. Mamiye, then, asserts a right to the interpleaded fund entirely upon the efficacy of its attachment as a general judgment creditor of Commonwealth.

(2) *Horizon Medical Administrators, Inc.* (*"Horizon"*)

Horizon purchased a casualty insurance policy from Commonwealth covering certain premises of Horizon for the period from October 9, 1978, through October 9, 1979. Horizon suffered damage to those premises and filed a claim with Commonwealth in July, 1979. Commonwealth did not pay Horizon's claim, so Horizon brought suit in New York. Commonwealth and Horizon settled the New York litigation for a promise by Commonwealth to pay $83,000 by March 14, 1983; if Commonwealth did not pay, Horizon could confess judgment against Commonwealth on March 15. Affidavit of Confession of Judgment, *Horizon Medical Administrators, Inc. v. Commonwealth Marine General Assurance Company, Ltd.*, Index No. 7277/81 (N.Y.Sup.Ct., County of Bronx, January 24, 1983). When Commonwealth did not pay, Horizon confessed judgment against Commonwealth on March 15 for the $83,000 plus $80 of costs.

On March 16, Horizon filed the New York judgment in the Court of Common Pleas, filed a praecipe for a writ of execution, obtained the writ, and had the writ served on Fidelity. Docket, *Horizon Medical Administrators, Inc. v. Commonwealth Marine General Assurance Co., Ltd.*, No. 2265, March Term (Pa.C.P., Phila. County, April 8, 1983).

In its answers to Horizon's attachment interrogatories, Fidelity disclosed the existence of the Trust Fund. On April 6, 1983, Horizon submitted to Fidelity a certified copy of the New York judgment. Fidelity requested further proof of this judgment's finality pursuant to article II, paragraph 2(c), of the Trust Agreement. Commonwealth complied on April 18.

Horizon, then, claims against the fund both as an attaching creditor and as a claimant under the Trust Agreement. Horizon claims $83,080 plus interest from March 15, 1983, costs and attorneys' fees.

(3) *George K. Lynch* (*"Lynch"*)

Lynch purchased insurance covering a truck and trailer from Commonwealth. In June, 1982, an accident caused $12,900 of damage to the truck and trailer. When Commonwealth did not pay Lynch's claim, Lynch brought suit in Texas and obtained a default judgment. *Lynch v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 83-081 (Tex.D.Ct., El Paso County, Feb. 25, 1983). On February 25, the same day as the judgment, Lynch gave notice to Fidelity and asserted a claim un-

4. As explained below, under Pennsylvania law Mamiye is entitled to nine percent per annum simple interest from the date of its New York judgment. However, as also explained below, Mamiye will probably not recover its principal, let alone its interest, in this proceeding, so the amount of Mamiye's interest makes little difference.

der the Trust Agreement. However, Lynch did not at that time provide Fidelity with a certified copy of the docket entries in the Texas action showing that Commonwealth had not appealed. Fidelity received the copy of the docket entries on March 28.

Lynch filed a Statement of Claim in this action on June 20, 1983. The Statement of Claim for some reason only asserts a claim to $12,000, rather than the $12,900 figure in the Texas default judgment and Fidelity's initial and amended complaints. Lynch has not moved for summary judgment and he has not responded to any of the other motions for summary judgment. Thus, although Lynch claims under the Trust Agreement, his claim appears in a difficult procedural posture.

(4) *G.A. Brown ("Brown")*

Brown also purchased an insurance policy from Commonwealth to cover a tractor and trailer which Brown used in his business. An accident damaged the truck and Brown made a claim under his policy on August 12, 1982. Commonwealth's adjuster authorized repairs to be made on the tractor and trailer, so Brown took the truck to a repair shop. Commonwealth never paid the repair bill. The repair shop kept the tractor and trailer causing Brown to lose considerable business.

Brown sued Commonwealth in Texas on his policy. Brown obtained a default judgment for $112,066.02 in damages, $5,000 of attorneys' fees, and post-judgment interest at the rate of nine percent. *Brown v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 13,501 (Tex.D.Ct., Morris County, Mar. 15, 1983).

On March 15, Brown made a claim against the Fund by notifying Fidelity of the Texas judgment. On April 30, Brown provided Fidelity with a certified copy of the Texas docket showing that the appeal period had run.

Brown filed his Texas judgment in the Court of Common Pleas. *Brown v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 6651, March Term (Pa.C.P., Phila. County, March 31, 1983). Brown had a writ of execution served on Fidelity on April 4. Brown had a second writ served on Fidelity on either April 27 or April 28.[5]

Brown, then, claims as both an attaching creditor and as a claimant under the Trust Agreement.

(5) *Maurice L. Jackson ("Jackson")*

Jackson purchased an insurance policy from Commonwealth covering Jackson's Portland, Oregon, planing mill and the personal property associated with the mill. The mill sustained windstorm damage in November, 1981, and Jackson made a claim under his policy. Commonwealth did not pay Jackson's claim so Jackson sued in Oregon. The Oregon court entered a default judgment against Commonwealth for $13,906.93 of general damages, $1,251.62 of prejudgment interest, $25,000 of punitive damages, $86.50 of costs, and post-judgment interest at nine percent per annum. *Jackson v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 8208–05027 (Or. Circuit Ct., Multnomah County, Feb. 14, 1983).

Jackson made a claim against the Trust Fund on March 15 and gave Fidelity adequate assurance that no appeal had been taken on April 8. Jackson, then, claims solely under the Trust Agreement.

(6) *Floyd Fountain ("Fountain") and Farmers State Bank of Center, Texas ("Farmers")*

Fountain owned a truck in which Farmers held a security interest. Commonwealth issued an insurance policy on the truck with Farmers as the loss payee. In June, 1982, an accident caused $12,000 of damage to the truck. Commonwealth did not pay on its insurance policy.

Fountain and Farmers sued in Texas court and obtained a default judgment

5. The common pleas docket sheet submitted by Brown gives April 27 as the date of second service upon Fidelity. Statement of Claim of G.A. Brown, exh. E (filed June 20, 1983). The Amended Complaint gives April 28 as the date. Amended Complaint, ¶ 32. In view of my conclusion regarding the validity of attachments, the discrepancy in dates makes no difference.

against Commonwealth for $12,000 of general damages, $4,000 of attorneys' fees, court costs, and post-judgment interest at the rate of nine percent per annum. *Fountain v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 21,065 (Tex.D.Ct., Shelby County, April 8, 1983). On April 8, Fountain and Farmers made a claim against the Fund, informing Fidelity that the appeal period would run until May 9. Neither Fountain nor Farmers gave Fidelity any further notice that Commonwealth had not appealed until they filed a Statement of Claim in this interpleader action on June 13. Fountain and Farmers claim only under the Trust Agreement.

(7) *Pak-Mor Manufacturing Company ("Pak-Mor")*

Pak-Mor purchased liability insurance from Commonwealth on which Commonwealth failed to perform. Pak-Mor sued in Texas, obtaining a default judgment for $460,749.68 and post-judgment interest at the rate of nine percent per annum. *Pak-Mor Manufacturing Co. v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 82–CI–19634A (Tex.D.Ct., Bexar County, April 4, 1983). Judge Biery's judgment in that case details Commonwealth's failures to perform.

Pak-Mor filed its Texas judgment in the Court of Common Pleas on April 18. *Pak-Mor Manufacturing Co. v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 4139, April Term (Pa.C.P., Phila. County, April 18, 1983). On the same day Pak-Mor obtained a writ of execution and Pak-Mor had the writ served on April 19.

On May 10 Pak-Mor made a claim under the Trust Agreement. On May 11, Fidelity submitted proof to Fidelity that Commonwealth had never appealed.

Accordingly, Pak-Mor claims pursuant to its attachment and also under the Trust Agreement.

(8) *Delan Townson ("Townson") and First Alabama Bank of Conecuh County ("First Alabama")*

Townson owned a truck in which First Alabama held a security interest. Townson and First Alabama insured the truck with Commonwealth. On February 26, 1982, an accident caused $7,000 of damage to the truck. Commonwealth did not pay on its policy, so Townson and First Alabama sued. An Alabama court entered a default judgment against Commonwealth for $6,500 plus court costs amounting to $42.65. *Townson v. Commonwealth Marine & General Assurance Co., Ltd.*, No. CV–83–009 (Ala.Circuit Ct., Conecuh County, April 19, 1983).

Townson and First Alabama claimed under the Trust Agreement on April 23, 1983. However, on April 23 they could not certify that the appeal period had run on their Alabama judgment. This certification is included in their Statement of Claim filed June 13.

(9) *Phillips & Sons, Inc. ("Phillips")*

Phillips purchased automobile liability insurance from Commonwealth on which Commonwealth has not paid. Phillips instituted suit in Texas for its actual damages due to Commonwealth's failure to defend Phillips in several actions covered by the insurance policy and for treble damages under the pertinent Texas statute. After this interpleader action had begun Phillips obtained a judgment in the amount of $219,840.28 plus post-judgment interest at the rate of nine percent per annum. *Phillips & Sons, Inc. v. Commonwealth Marine and General Assurance Co., Ltd.*, No. 83–17162 (Tex.D.Ct., Harris County, Sept. 7, 1983). Phillips had attempted to assert its claim without the judgment, but amended its motion for summary judgment to reflect the Texas court's ruling on September 9. On November 14 Phillips gave notice that Commonwealth had not appealed.

(10) *Hutchinson Financial Corporation of Alabama ("Hutchinson")*

Hutchinson was the loss payee on a fire, theft and casualty insurance policy issued

by Commonwealth to one Ledbetter covering Ledbetter's truck. The truck caught fire on April 30, 1982 and was totally destroyed. Commonwealth failed to pay on its policy.

Hutchinson sued Commonwealth in Alabama court, obtaining a judgment for $1,650 plus $34.55 in court costs. *Hutchinson Financial Corp. v. Commonwealth Marine & General Assurance Corp., Ltd.*, No. DV–83–053 (Ala.D.Ct., Calhoun County, March 23, 1983). Hutchinson made a claim on the Fund through Fidelity on May 11, 1983 by sending Fidelity a copy of the docket in the Alabama action. The notice sent Fidelity said nothing concerning the appeal period. Hutchinson's Statement of Claim in this interpleader action, however, contained such an affidavit from the Alabama clerk of court. Hutchinson filed its Statement of Claim on July 19.

(11) *NEB, Ltd. ("NEB")*

NEB purchased fire insurance for its restaurant from Commonwealth. In April, 1982, NEB suffered a fire loss at its business which Commonwealth did not pay. NEB sued in Hawaii court and obtained a default judgment for a total of $201,897.28 plus post-judgment interest at a rate of ten percent per annum. *NEB, Ltd. v. Commonwealth Marine & General Assurance Co., Ltd.*, Civil No. 74196 (Haw.Circuit Ct., 1st Cir., May 16, 1983). NEB gave Fidelity notice of this judgment, thereby making a claim against the Fund, on June 10. The appeal period ran on June 11.

(12) *Anne and Art Johnston d/b/a Treasure Harbor Sailing Yachts ("The Johnstons")*

The Johnstons obtained a judgment against Commonwealth for $34,000 in a Florida proceeding. *Johnston v. Welch*, No. 81–9212 (Fla.Circuit Ct., 11th Cir., April 13, 1983). Although the caption in that case indicates that the matter involved an insurance policy—one of the defendants, subsequently dismissed, is an insurance agency—the record before me on summary judgment does not reflect this fact.

The Johnstons filed their Florida judgment in the Court of Common Pleas. *Johnston v. Commonwealth Marine and General Assurance Co., Ltd.*, No. 585, June Term (Pa.C.P., Phila. County, June 8, 1983). That judgment named Fidelity Bank as a garnishee. Fidelity received notice of that judgment on June 17. The Johnstons did not obtain a writ of execution against Fidelity.

(13) *Reid, Inc. ("Reid")*

Reid sold a truck to one Taylor. International Harvester Credit Corporation financed the truck. Commonwealth issued an insurance policy on the truck naming International Harvester Credit as the loss payee. Reid remained contingently liable to International Harvester Credit on the truck. An accident destroyed the truck. Taylor defaulted on the debt. Commonwealth did not pay on its policy.

Reid and International Harvester Credit sued Taylor and Commonwealth in Georgia court. On July 5, 1983, Reid and International Harvester Credit took a default judgment against Commonwealth. *Reid v. Taylor*, Civil Action No. 83–S–261 (Ga.Super.Ct., Coffee County, July 5, 1983). With its Statement of Claim, Reid has filed the certificate of the clerk of the Superior Court of Coffee County that, as of August 18, no appeal had been filed. Reid avers that the appeal period has run. International Harvester Credit has assigned all of its rights in the Georgia judgment to Reid. Reid, then, claims under the Trust Agreement by virtue of the notice given in its Motion to Intervene and Statement of Claim filed August 29.

(D) *Chronology*

As will become clear below, the chronological sequence in which events occurred will determine the rights of the parties in this matter. Four events—in addition to those described in the previous subsection of this Opinion and tabulated in the next paragraph—have possible relevance. *First*, on February 23, 1983, Fidelity gave notice of its intention to resign as trustee

of Commonwealth's trust. *Second,* on April 23, 1983, this notice took effect and Fidelity resigned. *Third,* on April 29, Fidelity commenced this action and paid the interpleaded fund into court. *Fourth,* on May 19 I entered an Order pursuant to 28 U.S.C. § 2361 which restrained and enjoined all claimants in this action from "instituting or prosecuting or carrying forward in any manner, any suit or action in any court, state or federal, against plaintiff relating to the disposition of the interpleader fund now within the jurisdiction of the court, except as a claimant in this action."

With respect to each claim, six events have particular importance. *First,* obtaining a judgment against Commonwealth. For those proceeding under the Pennsylvania rules: *second,* entering the judgment in Pennsylvania court and, *third,* serving a writ of execution upon a garnishee. For those claimants proceeding under the Trust Agreement, the *fourth, fifth* and *sixth* events correspond to satisfying the three requirements of the Trust Agreement beyond obtaining a judgment: making a claim on the Fund, proving the judgment's "finality" (no appeal has been taken), and waiting thirty days. The following table illustrates the times of these six events for each claimant.

CHRONOLOGICAL TABLE

| Date | Judgment | Entered In Pa. | Writ Served | Claim Made | Finality Certified | 30 Days Expired |
|---|---|---|---|---|---|---|
| ?/??/82 | Mamiye | | | | | |
| 5/28/82 | | Mamiye | Mamiye | | | |
| 2/14/83 | Jackson | | | | | |
| 2/23/83 | FIDELITY NOTICE OF RESIGNATION AS TRUSTEE | | | | | |
| 2/25/83 | Lynch | | | Lynch | | |
| 3/15/83 | Horizon<br>Brown | | | Jackson<br>Brown | | |
| 3/16/83 | | Horizon | Horizon | | | |
| 3/23/83 | Hutchinson | | | | | |
| 3/28/83 | | | | | Lynch | |
| 3/31/83 | | Brown | | | | |
| 4/ 4/83 | Pak-Mor | | Brown #1 | | | |
| 4/ 6/83 | | | | Horizon | | |
| 4/ 8/83 | Fountain | | | Fountain | Jackson | |
| 4/13/83 | Johnston | | | | | |
| 4/18/83 | | Pak-Mor | | | Horizon | |
| 4/19/83 | Townson | | Pak-Mor | | | |
| 4/20/83 | | | | | Brown | |
| 4/23/83 | FIDELITY RESIGNS | | | Townson | | |
| 4/27/83 | | | Brown #2 | | | Lynch |
| 4/29/83 | COMPLAINT FILED AND FUND PAID INTO COURT | | | | | |
| 5/8/83 | | | | | | Jackson |
| 5/10/83 | | | | Pak-Mor | | |
| 5/11/83 | | | | Hutchinson | Pak-Mor | |
| 5/16/83 | NEB | | | | | |
| 5/18/83 | | | | | | Horizon |
| 5/19/83 | CLAIMANTS' ACTIONS IN OTHER COURTS STAYED | | | | | |
| 5/20/83 | | | | | | Brown |
| 6/ 8/83 | | Johnston | | | | |

CHRONOLOGICAL TABLE

| Date | Judgment | Entered In Pa. | Writ Served | Claim Made | Finality Certified | 30 Days Expired |
|---|---|---|---|---|---|---|
| 6/10/83 | | | | NEB | NEB | Pak-Mor |
| 6/13/83 | | | | | Fountain<br>Townson | |
| 7/ 5/83 | Reid | | | | | |
| 7/10/83 | | | | | | NEB |
| 7/13/83 | | | | | | Fountain<br>Townson |
| 7/19/83 | | | | | Hutchinson | |
| 8/18/83 | | | | | | Hutchinson |
| 8/29/83 | | | | Reid | Reid | |
| 9/ 7/83 | Phillips | | | | | |
| 9/ 9/83 | | | | Phillips | | |
| 9/28/83 | | | | | | Reid |
| 11/14/83 | | | | | Phillips | |
| 12/14/83 | | | | | | Phillips |

## III. LEGAL ANALYSIS

### (A) *Law Applicable to this Action*

Fidelity brought this interpleader action pursuant to the federal interpleader statute, 28 U.S.C. § 1335. However, "[u]nder *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), state law determines the rights of the rival claimants to the interpleaded fund." *Federal Insurance Co. v. Areias,* 680 F.2d 962, 963 (3d Cir.1982). Accordingly, in determining the rights of the parties before me, I must apply the law that a Pennsylvania court would apply.

As I have outlined, defendants in this action pursue claims under two theories. The first involves perfection of a claim under the Pennsylvania Rules of Civil Procedure governing attachment. Pennsylvania law governs the validity of any attachment under those rules.

The second sort of claim proceeds directly under the Trust Agreement. The second paragraph of article IV of the Trust Agreement provides that "[t]he provisions of [sic] the validity and construction of this Trust Agreement and any amendments or supplements thereto shall be governed by and determined according to the laws of the State of Pennsylvania."

Therefore, Pennsylvania law governs all claims to the Fund made in the pending motions for summary judgment.

### (B) *Perfection of a Claim by Attachment*

Four claimants have served writs of execution upon Fidelity: Mamiye on May 28, 1982, Horizon on March 16, 1983, Brown on April 4, 1983 and again on April 27, and Pak-Mor on April 19, 1983. In addition to these four, the Johnstons entered their April 13 judgment in Pennsylvania court on June 8, 1983 pursuant to the Uniform Enforcement of Foreign Judgments Act, 42 Pa.Cons.Stat.Ann. § 4306 (Purdon 1981). While a prerequisite to execution of the judgment in Pennsylvania, the filing of a judgment in Pennsylvania court does not have any immediate effect of itself. *See Id.* The Johnstons have not argued that their filing in Pennsylvania operates as an attachment. Further, as I discuss below, their filing comes too late to share in the Fund, even if it effectively perfected a claim.

The parties have disputed whether attachment can perfect a claim against assets held by Fidelity in trust for Commonwealth. No party has challenged the proposition that claimants can validly attach

non-trust assets of Commonwealth held by Fidelity, such as checking accounts.

As discussed in the preceding section, by serving a writ of execution upon a garnishee, a judgment creditor can attach "all property of the defendant which may be attached under" the Pennsylvania Rules of Civil Procedure to satisfy the creditors' judgment against the defendant. Pa.R. Civ.P. 3111(b) (Purdon 1975). The attachability question, then, becomes the question of whether the Trust Fund was "property of [Commonwealth] which may be attached under these rules" at any time while in Fidelity's possession.

Rule 3108(a)(4) permits service of a writ of attachment by a sheriff upon a garnishee "in the case of ... other tangible personal property and rents ...." Rule 3101(b) provides:

> Any person may be a garnishee and shall be deemed to have possession of property of the defendant if he:
>
> (1) owes a debt to the defendant;
>
> (2) has property of the defendant in his custody, possession or control;
>
> (3) holds as a fiduciary property in which the defendant has an interest;
>
> (4) holds legal title to property of the defendant whether or not in fraud of creditors ....

This rule appears to cover Fidelity, if one can say that Commonwealth, as settlor of a trust for the benefit of certain of its creditors, still has an interest in that trust property.

Under Pennsylvania law a creditor may attach no more than a trust beneficiary's interest in the trust, with one exception. When a settlor puts assets in trust for himself, a creditor of the settlor/beneficiary may attach the corpus of the trust even if the settlor has included a spendthrift provision restricting the settlor's interest to an income interest. *Posner v. Sheridan,* 451 Pa. 51, 62, 299 A.2d 309, 314 (1973) (dictum); *In re Mogridge's Estate,* 342 Pa. 308, 20 A.2d 307 (1941).

■ In *Posner,* the court distinguished the case of a spendthrift trust with the settlor as income beneficiary from that of a spendthrift trust with someone other than the settlor as beneficiary. In *Posner,* a settlor had established a spendthrift trust to benefit plaintiff's husband. The husband had defaulted on his support obligation. The court refused to recognize the wife's attachment of the trust corpus; she could only reach the beneficiary's income interest as it came due. The court contrasted the *Mogridge* situation. In *Mogridge* the court allowed general creditors of a settlor/beneficiary of a spendthrift trust to reach the trust's corpus. The *Mogridge* court reasoned that the creation of a trust should not allow a settlor to put his assets out of reach of his creditors while retaining the assets' beneficial use to himself.

A settlor may, however, put certain assets out of reach of his general creditors while creating a trust for the benefit of some special class of his creditors. Such a "special deposit" may not be attached by a general creditor of the settlor. *See generally,* Annot., 8 A.L.R. 4th 998 (1981) ("Special bank deposits as subject of attachment or garnishment to satisfy depositor's general obligations").

■ For example, in *Austin-Nichols & Co., Inc. v. Union Trust Co.,* 289 Pa. 341, 137 A. 461 (1927), the court did not permit a general creditor of the settlor to attach a special trust fund established for the payment of the settlor's taxes. Similarly, in *Converse v. Hawse,* 326 Pa. 1, 190 A. 899 (1937), the court would not permit a creditor of Hawse to attach a debt which the Doylestown Trust Company owed to Hawse because Hawse had put that debt in trust for the payment of Hawse's debt to a third party. The court reasoned that "[a]n attaching creditor stands in the shoes of his debtor. If the latter is not the rightful owner of the money attached, the attachment will not hold it."

When the settlor retains the right to direct payment out of a special deposit to the class of special creditors, a member of that sub-class of creditors may attach the special deposit as if the deposit were an unrestricted asset of the settlor. In effect,

as to the special creditor's claim, the fund *is* an unrestricted asset of the settlor. Thus, in *Hays v. Lycoming Fire Insurance Co.*, 98 Pa. 184 (1881) (*Hays I*), the court held that an insured could execute a judgment against his insurance company by attaching a note made by one of the insurance company's members. The company had some insureds as to whom the company was a mutual insurance company and others, like Hays, as to whom it was not. The insurance company held notes from its mutual members in trust. The insurance company could assess these notes to pay claims. Hays' was such a claim. Therefore, Hays could attach the note. Hays' attachment even sufficed to execute against the insurance company's receiver. *Hays v. Lycoming Fire Insurance Co.*, 99 Pa. 621 (1882) (*Hays II*).

The Trust Agreement between Commonwealth and Fidelity created a special deposit. The Trust Agreement only authorizes Fidelity to pay the claims of holders of American policies of insurance. Further, those policyholders must meet four conditions: they must obtain a judgment, notify Fidelity of the judgment, certify that the judgment has become final, and wait thirty days. However, the Trust Agreement permits Commonwealth "at its option [to] waive any or all of the foregoing conditions mentioned in Subdivisions (A), (B), (C), and (D) hereof and [to] direct the Trustee in writing to pay from the Trust Fund the claim of any policyholder against the Company under an American policy without such claim having become enforceable as above defined ...." Trust Agreement, art. II, ¶ 2.

(1) *Validity of Horizon, Brown, and Pak-Mor Attachments*

At the time of attachment, neither Horizon, nor Brown, nor Pak-Mor had satisfied the four conditions imposed by the Trust Agreement. All, however, had claims based upon American policies as defined by the Trust Agreement. All three policies were payable in U.S. funds and therefore were "American policies." *See* Trust Agreement, art. I. Horizon is a New York corporation. Brown is a citizen of Texas. Pak-Mor is a Texas corporation. All, therefore, constitute "policyholders" within the meaning of the Trust Agreement. *Id.*

The proviso in the second paragraph of article II of the Trust Agreement gives Commonwealth the right to waive any of the four requirements of that paragraph and to require the trustee to pay the claim of any holder of an American policy. Commonwealth, through this provision, retains an interest in the Trust's assets; Commonwealth may use the Trust corpus to pay any of its debts under claims arising out of American policies. Accordingly, any claimant under an American policy can attach the Fund pursuant to Pennsylvania law as announced in *Hays I.* Horizon, Brown, and Pak-Mor each successfully attached the Fund under this rule.

(2) *Validity of Mamiye's Attachment*

The Mamiye attachment presents two separate problems. First, Mamiye conceded at oral argument that it did not claim under an American policy. Second, Commonwealth has moved to open the New York judgment underlying Mamiye's attachment. The Pennsylvania court has stayed the Pennsylvania judgment. Pak-Mor has moved to intervene in the New York proceedings, alleging fraud.

(A) *Attachability of Interpleaded Fund by Mamiye as General Creditor of Commonwealth*

Because Mamiye does not claim under an American policy, it cannot claim to have attached Trust assets under the *Hays I* rule. Rather, Mamiye can only attach if it can show that Fidelity held some of Commonwealth's funds free from the Trust's special deposit provisions at any time, or that the interpleaded fund now contains assets not impressed with Commonwealth's Trust.

Mamiye initially points to several provisions of the Trust Agreement which Mamiye contends make the Fund controllable by Commonwealth and not Fidelity. *See*

Memorandum of Law Accompanying Defendant Mamiye's Motion for Summary Judgment at 4 (filed Aug. 25, 1983). Mamiye first contends that article II, paragraph 2 of the Trust Agreement, discussed above, brings the Fund within Commonwealth's control. Certainly the proviso of this paragraph allows Commonwealth to pay any claimant under an American policy, but the proviso does not permit Commonwealth to pay any general creditor out of the Fund. Therefore, Mamiye can draw no support from this provision.

Second, Mamiye argues that Commonwealth's responsibility to direct investment of the Trust's assets, Trust Agreement, art. II, ¶ 5, and Commonwealth's right to substitute equivalent value deposits for the Fund, *Id.*, art. II, ¶ 6, makes this Fund a general asset of Commonwealth's. This argument is unpersuasive. The fact that Commonwealth could direct management of the Trust Fund does not mean that Commonwealth retained the right to pay any of its general debts from the Fund.

Mamiye further argues that because the Trust would terminate on Commonwealth's qualifying to do insurance business in the United States, the Trust Fund is therefore controllable by Commonwealth. Trust Agreement, art. II, ¶ 11. The argument is a *non sequitur.*

Finally, Mamiye argues that Commonwealth's reserved powers to remove the trustee, Trust Agreement, art. III, ¶ 9, and to amend the Trust Agreement with the trustee's written consent, *Id.*, art. IV, ¶ 3, make the Fund controllable by Commonwealth. The first of these powers does not affect the applicability of the special deposits rule. The second does. If Commonwealth had, with Fidelity's assent, amended the Trust so as to permit Commonwealth unlimited authority to order payment to its creditors, then Mamiye could recover.

Mamiye asserts that correspondence between Fidelity and Commonwealth indicates that both Fidelity and Commonwealth treated the Trust Fund as if it contained funds usable according to Commonwealth's unfettered discretion. On February 15, 1980, Federico Martinez Montes de Oca wrote to Fidelity on behalf of Commonwealth stating Commonwealth's view that:

> Commonwealth has a free and clear U.S. Dollar Trust Account in the amount of $517,298.61 (Less an error of adjustment of .87) (This sume [sic] being invested in C.A.'s [sic] of your bank) .... With regards to the U.S. Dollar Trust, we would like advices as to when interest is paid to us. As we understand it this interest is payable to our Commercial Account with your bank and then the majority of same is invested as per suggestion but subject to our acquiescense [sic] and control.

On March 4, 1980, Fidelity wrote back to Commonwealth confirming the purchase of a $500,000 certificate of deposit for Commonwealth's Trust Account maturing on April 24, 1980, and various other housekeeping matters. In addition, Fidelity wrote: "Funds are held under our control with no checking account in order for us to make investments. The funds belong to you, therefore anytime you wish some or all of these funds we shall be glad to send this to you."

On June 2, 1980, Commonwealth again wrote to Fidelity. This letter makes clear that the issue of control and discretion over funds related solely to interest upon maturing Trust Fund investments. "What we would like as of July 24, 1980, is for you to reinvest the $500,000 Trust Fund in C.D.'s of your Bank and for you to deposit the other maturing funds, i.e. $87,378.47, in our Commercial Checking account, then for you to invest $75,000 of the Commercial Checking account money in such Treasuries as you may choose."

This correspondence does not raise a material issue of fact concerning amendment of the Trust Agreement. In the first place, article IV, ¶ 3 of the Trust Agreement provides:

> The Company shall have the right to amend, modify, or extend in whole or in part this Trust Agreement and the Trust created thereby provided that no such amendment, modification or extension

shall be effective without the written consent of the Trustee thereto. The Trustee shall have absolute and uncontrolled discretion either to give or to withhold its consent hereunder .... Such amendment, modification, or extension shall be set out in an instrument in writing executed by the duly authorized representatives of the Company and the Trustee.

A jury could not find that the letters presented by Mamiye constitute an amendment of the Trust Agreement because none is executed by both Commonwealth and Fidelity.[6]

Although Mamiye's submission has not made the point very clearly, Mamiye's attachment is effective in one respect. Mamiye has effectively attached all funds held by Fidelity belonging to Commonwealth and not impressed with the Trust. Specifically, Mamiye has attached all income, as opposed to principal, generated by the Trust Fund. Commonwealth retained the income interest in the Trust. Article I defines "trust fund" to mean:

> The cash or Certificates of Deposit of a bank member of the U.S. Federal Reserve System or in U.S. Government bonds or notes, or U.S. Government guaranteed obligations or obligations of any state of the United States from time to time in the hands of the Trustee hereunder constituting the principal (as distinguished from the income) of the Trust hereby created.

Commonwealth had an unfettered right to the income on the certificates of deposit purchased by Fidelity; the income did not become impressed with a trust upon receipt by Fidelity. Trust Agreement, art. II, ¶ 8. This explains the correspondence between Fidelity and Commonwealth concerning the opening of a commercial checking account.

The record before the court on these motions for summary judgment does not permit a finding as to how much of the $440,891.61 paid into court constituted income, and how much principal. The Amended Complaint asserts that "[t]his sum represents interest accrued on the balance of $440,702.17 in the fund as of the date of termination of the Trust Agreement."[7] Amended Complaint ¶ 16. Therefore, at least some of the amount paid into court consisted of income and not principal. Further, in its answers to Brown's interrogatories in attachment, Fidelity stated that "[a]t the time the Writ was served said account maintained the following investments: A certificate of deposit in the face amount of $400,000.00 which came due on April 21, 1983; a United States Treasury Bill in the face amount of $30,000.00 which also came due on April 21, 1983 and a cash balance of $1,238.10." Amended Complaint, exh. K. Now, the amount on hand on April 29 exceeded $431,238.10, so some must have been income. Further, the court takes judicial notice of the fact that United States Treasury Bills are discount bonds—one purchases the bill at less than its face value and receives the face value at maturity. Therefore, some of the $30,000 treasury bill might properly be allocable to income and not be impressed with Commonwealth's Trust. Because the parties have not briefed the issue, I reserve judgment on whether article II, ¶ 9 makes all of a discount bond's face value allocable to principal. Accordingly, Mamiye apparently perfected a claim to some of the funds paid into court, but on the present record the court cannot determine how much is subject to Mamiye's attachment. However, the amount of principal must be at least $400,000, the value of the certificate of deposit.

The Amended Complaint takes the apparent position that the Trust terminated on the date of Fidelity's resignation as

6. Because the Trust Agreement requires Fidelity's assent to any amendment of the Agreement, I need not explore the question whether in Pennsylvania an attaching creditor can attach his debtor's reserved unilateral right to revoke or amend a trust.

7. As discussed below, some of the parties, apparently including Fidelity, have taken the position that Fidelity's resignation as trustee on April 23, 1983 terminated the Trust, a contention which I find unsupported by Pennsylvania law.

trustee. Amended Complaint ¶ 16. If the Trust did actually terminate on April 23, 1983, Mamiye would have the ability to reach all of the funds paid into court. If the Trust terminated, Fidelity would have had in its hands assets of Commonwealth not impressed with any trust between April 23 and April 29, the date Fidelity paid the fund into court.[8]

The Trust Agreement permits the trustee to resign by giving Commonwealth sixty days' notice. Trust Agreement, art. III, ¶ 9. However, the Trust Agreement also provides for appointment of a successor trustee by Commonwealth. Therefore, resignation of the trustee, of itself, cannot terminate the Trust. In fact, the Trust Agreement has a specific provision for termination which is separate from the provision for resignation of the trustee. Trust Agreement, art. II, ¶ 11.[9]

While it is often said that a valid trust requires a *res*, a beneficiary, and a trustee, "[t]he general statement is made that a trust will not fail for want of a trustee." *Sherwin v. Oil City National Bank*, 229 F.2d 835, 838 (3d Cir.1956). The Pennsylvania Orphans Court has general jurisdiction to replace trustees who vacate their positions. 20 Pa. Cons.Stat.Ann. § 7101 (Purdon 1975). The Orphans Court also has authority to remove trustees under certain circumstances. *Id.*, § 7121. These powers of the court imply that the absence of a trustee for some period will not cause a Pennsylvania trust to fail. The resignation of Fidelity did not terminate the Trust Agreement. Rather, Fidelity's resignation merely left the position of trustee vacant.

(B) *Effect of Challenge to Mamiye's Judgment*

In order to have a valid attachment, a creditor must have a judgment to be enforced. Pa.R.Civ.P. 3102 (Purdon 1975). " '[J]udgment' means a judgment, order or decree requiring the payment of money entered in any court which is subject to" the Pennsylvania Rules of Civil Procedure. Pa.R.Civ.P. 3101(a) (Purdon 1975). The creditor must therefore have a Pennsylvania judgment in order to enforce the judgment by a writ of execution.

Mamiye had a New York judgment against Commonwealth. Mamiye converted this New York judgment into a judgment enforceable in Pennsylvania by filing the judgment in the Philadelphia County Court of Common Pleas under the Uniform Enforcement of Foreign Judgments Act, 42 Pa. Cons.Stat.Ann. § 4306 (Purdon 1981).

> A judgment so filed shall be a lien as of the date of filing and shall have the same effect and be subject to the same procedures, defenses and proceedings for reopening, vacating, or staying as a judgment of any court of common pleas of this Commonwealth and may be enforced or satisfied in like manner.

42 Pa. Cons.Stat.Ann. § 4306(b) (Purdon 1981). Section 4306(d)(2) specifically permits the common pleas judge to stay enforcement of a foreign judgment filed in Pennsylvania in the same way as the Pennsylvania court would stay a domestic judgment's enforcement.

As mentioned above, one enforces a judgment to pay money by execution under the Rules of Civil Procedure. Pa.R.Civ.P. 3102 (Purdon 1975). "Execution may be stayed by the court as to all or any part of the property of the defendant upon its own motion or application of any party in interest showing ... any other legal or equitable ground therefor." Pa.R.Civ.P. 3121(b)(2) (Purdon 1975). Judge Gafni has done so, ordering "that all other proceedings in the Commonwealth of Pennsylvania are to be stayed until such time as there is a final determination as to the merits of

8. Termination of the trust would also waive the thirty-day wait requirement for perfection under the Trust Agreement. Trust Agreement, art. II, ¶ 2.

9. The court notes that the termination date of the Trust Agreement has been left blank on all copies of the agreement presented in the record of this matter. A trust may last indefinitely, subject to the Rule Against Perpetuities where applicable. Apparently, Commonwealth's Trust will never terminate merely through passage of time.

this cause of action in the Courts of the State of New York." *J.E. Mamiye & Sons, Inc. v. Commonwealth Marine & General Assurance Co., Ltd.*, No. 6566, May Term, 1982 (Pa.C.P., Phila. County, June 22, 1982).

On June 22, 1982, the date Judge Gafni's stay was entered, Mamiye had already served its writ of execution and interrogatories upon Fidelity. The writ and interrogatories in effect operate like a summons and complaint in an assumpsit action, although they also constitute the "attachment." *See* Pa.R.Civ.P. 3111(a), 3144, 3145 (Purdon 1975). Service of the writ freezes the assets of the defendant in the hands of the garnishee. Pa.R.Civ.P. 3111(b), (c) (Purdon 1975). However, the creditor has no right to the property until he obtains a judgment against the garnishee. Pa.R. Civ.P. 3146, 3147 (Purdon 1975 and Supp. 1982). Accordingly, Judge Gafni's stay did not affect the validity of Mamiye's attachment; Judge Gafni's stay merely precludes Mamiye from obtaining a judgment against Fidelity until the stay is lifted.

The recent decision of the Pennsylvania Supreme Court in *Everson v. Everson*, 494 Pa. 348, 431 A.2d 889 (1981), makes clear that the stay of execution does not affect the validity of the attachment. In that case, an Arizona court granted the Eversons a divorce and gave Mrs. Everson a judgment against Mr. Everson for one half the value of the couple's community property. Mr. Everson refused to satisfy the judgment. Mrs. Everson filed the Arizona judgment in the Lehigh County Court of Common Pleas and served a writ of execution upon the trustee of a trust in which Mr. Everson held a remainder interest as separate property. Meanwhile, the Eversons had appealed the property decree in Arizona. Because Mr. Everson had not posted a bond in Arizona to stay enforcement of the judgment there, the common pleas judge refused to stay proceedings in Pennsylvania. The Supreme Court stated that:

> enforcement of the judgment in Pennsylvania was authorized by the Uniform Enforcement of Foreign Judgments Act, 42 Pa.C.S.A. § 4306, which provides that at any time after the filing of a foreign judgment, a levy may be made on any property of the judgment debtor subject to execution regardless of whether final judgment has been obtained.

494 Pa. at 359, 431 A.2d at 895.

Although Mrs. Everson could technically attach during the pendency of Mr. Everson's Arizona appeal, the Supreme Court noted that the trial court ought to have stayed execution. The Supreme Court itself ordered a stay because the Arizona Supreme Court had modified and remanded the property award in the underlying case. The Arizona trial court was to conduct further proceedings. The Pennsylvania Supreme Court entered a stay of execution which did not dissolve the attachment. Rather, Mrs. Everson had attached Mr. Everson's interest in the trust corpus—which interest had vested during the course of the appeal—but could not obtain a judgment on the attachment until after the Arizona court determined the amount of her entitlement.

By the same token, Mamiye has a valid attachment on the income portion of the funds paid into court. This attachment preserves Mamiye's priority as against other creditors. However, Mamiye may not obtain a judgment until the stay of execution is lifted. I have stayed state court proceedings concerning the fund paid into court. Therefore, Judge Gafni cannot lift his June, 1982 stay. That becomes a matter for the federal court in interpleader. I will maintain the stay of execution on Mamiye's judgment until the conclusion of proceedings in New York; the material issue of fact concerning allocation of the interpleaded fund between principal and income precludes awarding judgment to Mamiye in any event.

(C) *Perfection of a Claim Under the Trust Agreement*

[9] As discussed above, perfection of a claim under the Trust Agreement requires compliance with four conditions. The

claimant must obtain a judgment, give the trustee notice of the judgment, satisfy the trustee that all appeals have been taken or that the appeal period has passed, and wait thirty days. Trust Agreement, art. II, ¶ 2. Compliance with this fourth condition—the thirty-day wait—is waived if the Trust terminates in the interim. However, this trust has not terminated. No claimant had a right to payment out of the Trust Fund until it had satisfied all four conditions, including the thirty-day period.

Reference to the chronological table of section II (D) of this Opinion makes clear that no claimant other than Lynch managed to perfect a claim under the Trust Agreement before Fidelity paid the Fund and its income into court. A court in interpleader may recognize claims perfected after commencement of the interpleader suit. The interpleader statute contemplates litigation of rights which may accrue in the future. *State Farm Fire & Casualty Insurance Co. v. Tashire,* 386 U.S. 523, 532–533, 87 S.Ct. 1199, 1204–1205, 18 L.Ed.2d 270 (1967); *United States v. Major Oil Corp.,* 583 F.2d 1152, 1157 (10th Cir.1978). The statute must therefore contemplate litigation of claims that become perfected during the law suit's pendency.

Satisfaction of the thirty-day requirement does not necessarily involve action on the part of the Trust's trustee. On the other hand, satisfaction of the third requirement does require a trustee because the claimant must satisfy the trustee of the claimant's judgment's finality. Only Lynch, Jackson, Horizon, and Brown satisfied the finality requirement before Fidelity's resignation. While the Trust has not terminated by virtue of that resignation, neither Commonwealth nor any court has appointed a successor trustee. A serious question presents itself, then, as to whether any claimant could perfect a claim under the Trust Agreement unless the claimant had satisfied Fidelity as to its judgment's finality before Fidelity resigned. One could argue that Fidelity, and then the court, held the Trust Fund as fiduciaries for Commonwealth and holders of its American policies after Fidelity's resignation as trustee. One could argue that as fiduciaries, Fidelity and the court had duties to permit perfection of claims as a trustee would. But, because of the disposition of the priority question in this case, discussed below, it will be unnecessary to determine the effectiveness of the attempts of claimants other than Lynch, Jackson, Horizon, Brown, and Pak-Mor to perfect their claims under the Trust Agreement.

(D) *Priority of Claims*

Reference to the chronological table will show that the two classes of claimants, those claiming by attachment and those claiming under the Trust Agreement, divide neatly in time. All attaching creditors perfected their claims before any Trust Agreement claimant perfected its claim. Specifically, Mamiye perfected a claim on non-Trust assets by attachment on May 28, 1982. Horizon perfected a claim by attachment on March 16, 1983. Brown perfected a claim by attachment on April 4, 1983. Pak-Mor perfected a claim by attachment on April 19, 1983. Brown's second service on April 27, 1983, served no purpose, Brown having already perfected its claim on April 4. Lynch perfected its claim under the Trust Agreement on April 27 and Jackson followed on May 8. If their perfections were effective, all other Trust Agreement claimants follow Jackson in time.

Horizon, Brown, and Pak-Mor's combined claims exceed the total amount paid into court with interest. Mamiye's claim will probably exceed the total value of non-Trust assets in the court's registry. Under a first-in-time, first-in-right rule, no claimant under the Trust Agreement can recover in this action. Therefore, I need not inquire into the priority of one Trust Agreement claimant's claim over another's if a subsequent Trust Agreement perfection does not give a Trust Agreement claimant equal or superior priority to a prior attaching creditor. If prior service of a writ of execution gives a claimant priority over another claimant under the Trust Agree-

ment, then only attaching creditors will recover from the fund.

Certain claimants in this action strongly urge that this court must award the fund to claimants on a *pro rata* basis. This effectively grants all claimants an equal priority. The argument for *pro rata* distribution begins with the decision in *Federal Insurance Co. v. Areias,* 680 F.2d 962 (3d Cir.1982). In that case, plaintiffs Katsiff and Schepis sought to recover lump sums representing some portion of the present value of worker's compensation benefits due from their bankrupt former employer. Federal Insurance, the employer's surety, brought an interpleader action against all worker's compensation claimants, paying the amount of the surety bond into court. The Court of Appeals stated that "the district court should have awarded Katsiff and Schepis *pro rata* shares of the interpleaded fund on that basis. *Cf. Hebel v. Ebersole,* 543 F.2d 14, 18 (7th Cir.1976) ('parties' claims to the fund are of the same nature, and we approve the district court's *pro rata* distribution')." 680 F.2d at 965 (footnote omitted).

*Hebel* involved an interpleader action against three claimants to a fund held by a bank. All three claimants had sold cattle to Ebersole who then sold the cattle to an auctioneer. The fund consisted of some of the proceeds of the auctioneer's sale of the cattle. The court held that "[t]he case at bar involves neither secured obligations nor a proceeding in bankruptcy. The parties' claims to the fund are of the same nature, and we approve the district court's *pro rata* distribution." *Hebel v. Ebersole,* 543 F.2d 14, 18 (7th Cir.1976).

*Burchfield v. Bevans,* 242 F.2d 239 (10th Cir.1957), helps make clear the positions taken by the *Hebel* and *Federal Insurance* courts. In *Burchfield* seven parties claimed against an automobile insurance policy. Each claimant had obtained a judgment within ten days of the others. All judgments were entered on the same day. The Court of Appeals held that under Oklahoma law a judgment created only an equitable lien on personal property and not a legal lien. In the absence of a legal lien, equity meant equality and the court enforced a *pro rata* distribution.

As in *Burchfield,* state law provided no clear rule for prioritizing claims in either *Hebel* or *Federal Insurance.* Thus, a federal court will distribute interpleaded funds *pro rata* in the absence of state law priority rules. State law does provide clear priority rules in this case.

Pennsylvania law establishes a first-in-time, first-in-right priority rule as between an attaching creditor and a claimant with an equitable lien under the Trust Agreement. An attaching creditor cannot attach property which the garnishee must pay to one other than the creditor's debtor. "When a creditor makes use of attachment process, he thereby treats the contract by which the garnishee acquired possession of the fund in his hands as valid .... He cannot seize the property of a third party though temporarily held by the debtor ..., or moneys held by him for another ...." *Austin-Nichols & Co., Inc. v. Union Trust Co.,* 289 Pa. 341, 346, 137 A. 461, 463 (1927) (citations omitted). Thus, in *Vincent v. Watson,* 18 Pa. 96 (1851), a debtor sold his business. A general creditor of the debtor sought to attach the purchase price, which the purchaser/garnishee had not yet paid. However, the purchase agreement between the garnishee and the debtor allowed the garnishee to first apply the purchase price to the debtor's debts related to the business. The debtor only had the right to obtain payment of the purchase price after the assumed debts had been paid; the attaching creditor had no better right. Similarly, in *Smith v. Keener,* 270 Pa. 578, 113 A. 912 (1921), and *Patten v. Wilson,* 34 Pa. 299 (1859), creditors attaching a judgment took after attorneys who had contingent fee arrangements with their successful clients.

*Austin-Nichols, Smith,* and *Patten* suggest that had a claimant here perfected his claim under the Trust Agreement before another claimant had attached, the Trust Agreement claimant would have priority over the attaching creditor. On the other

hand, the attaching creditor takes first if he attaches first. In *Cain v. Hockensmith Wheel & Car Co.*, 157 F. 992 (C.C.W.D.Pa. 1907), the court, applying Pennsylvania law, faced another situation in which an attaching creditor sought to recover from a judgment fund ahead of counsel for the successful plaintiff. The court held that in Pennsylvania

> no lien for counsel fees is ... recognized; the right of counsel to be paid out of a fund in hand being one of deduction or defalcation only. It attaches in favor of counsel, in other words, to that which he has in his actual possession .... [The court decided *Patten v. Wilson*] solely on the ground that the agreement between [the attorney] and his client amounted to an equitable assignment, and that, being prior, it was therefore superior to the attachment. In the present instance, however, the attachment is first, and so apparently entitled to priority ....

157 F. at 994. Here as well, all four attachments occurred before any claimant was entitled to payment from the Trust according to the Trust Agreement's terms. They therefore have priority over all Trust Agreement claimants.[10]

As between the four attaching creditors, Pennsylvania law also applies a first-in-time, first-in-right rule. Pa.R.Civ.P. 3137(b) (Purdon 1975) provides:

> When property is attached by service upon the garnishee of two or more writs of separate plaintiffs priority of distribution between them shall be determined by the date of service of their respective writs upon the garnishee as to all property then in the hands of the garnishee or coming into his possession up to time of judgment against him.

Under this Rule, as among the four attaching claimants, Mamiye comes first as the first to serve Fidelity, but only to the extent that the fund paid into court is not impressed with Commonwealth's Trust. Horizon follows Mamiye. Brown follows Horizon. Pak-Mor follows Brown. These four claims, in this order, exhaust the interpleaded fund.[11]

(E) *Amounts of Claims Recoverable from the Fund*

█ In order finally to distribute the interpleaded fund the court must determine the amount that each of the four successful claimants may recover from that fund. This involves resolution of three issues. First, the court faces the factual question

10. Mamiye, of course, attached assets by definition unreachable under the terms of the Trust Agreement; no beneficiary of the Trust could obtain a right to payment of funds not impressed with the Trust.

11. Even if one does not view state law as providing a clear prioritization rule in this case, a court cannot make a *pro rata* distribution in the sort of situation presented here. In *Burchfield* the court considered seven claims against a fund. In *Hebel*, the court considered three claims. In *Federal Insurance* the court considered two claims. In all three cases, the size of the class of possible claimants was known to the court and all possible claims were presented in the interpleader action. Such is not the case here.

If the court ordered a *pro rata* distribution, it would be necessary to order a distribution not only to the defendants in this action, but also to all individuals who could claim under the Trust Agreement or who could attach Commonwealth's assets. An interpleader action contemplates litigation of prospective claims. *United States v. Major Oil Corp.*, 583 F.2d 1152, 1157 (10th Cir.1978). Any of Commonwealth's unpaid policyholders could, within a reasonable time, obtain a judgment and perfect a claim to this fund. The court has received correspondence from a potential claimant in Indiana, Letter from Mary W. Grey, Esq. to Hon. Louis H. Pollak (Oct. 7, 1983), and from the representative of forty-five possible claimants in California, Letter from Joanne Monroe to Hon. Louis H. Pollak (Jan. 6, 1984). Some insureds of Commonwealth may incur losses in the future which Commonwealth will not pay. Therefore, all insureds of Commonwealth would have to be made parties to this litigation and purely hypothetical future claims would have to be litigated. To apply the *pro rata* distribution rule solely to those claims currently pending would be to distort the *pro rata* rule. Such a holding would create an artificial priority for the parties in this case. Without a discrete class of claimants to an interpleaded fund, the proposed *pro rata* rule simply proves unworkable. Fortunately, state law provides priority rules which obviate most of these problems as applied to this case.

of the interpleaded fund's proper allocation between Trust principal and non-Trust income. This first issue, of course, must await further proceedings. Second, each of the four successful claimants holds a state court judgment: Mamiye and Horizon have New York judgments; Brown and Pak-Mor have Texas judgments. The parties differ on whether they may recover interest on these state court judgments from the interpleaded fund. This interest has a dual quality. It is post-judgment interest with respect to the state judgments, but pre-judgment interest with respect to this action. I will require reargument on this question.[12]

At this point the court may, however, decide the third issue—how much Horizon and Brown may recover exclusive of interest on their state court judgments. This will allow the court to award these two parties an immediate partial summary judgment. It should also facilitate Pak-Mor and Mamiye's evaluation of their respective claims.

Brown holds a Texas judgment for $117,-066.02. This judgment includes treble damages, punitive damages, and attorney's fees. The parties differ as to whether Brown may recover this full amount from the interpleaded fund. The dispute centers exclusively on the extent to which Brown can attach Trust assets on the basis of this judgment. To the extent that Mamiye and Horizon do not exhaust the non-Trust assets in the interpleaded fund—an unlikely event—Brown's attachment is valid as to non-Trust assets.

As discussed above, a creditor who attaches a special deposit only has an effective attachment to the extent that he has a claim within the special deposit's purpose. Brown's service of a writ of execution upon Fidelity attached the Trust Fund because Commonwealth reserved the right to "waive any or all of the foregoing conditions ... and [to] direct the Trustee in writing to pay from the Trust Fund the claim of any policyholder against the Company under an American policy ...." Trust Agreement, art. II, ¶ 2. The parties dispute whether treble damages and attorney's fees constitute a "claim" within the meaning of this provision.

The Trust Agreement defines "claim" circularly: " 'CLAIM' means a claim against the Company by a policy holder for a loss under an American policy." Trust Agreement, art. I. Arguably this definition restricts Brown's "claim" to the direct loss compensable under his insurance policy and does not include any of Texas' statutorily prescribed additional recovery.

I find that a reading of the second paragraph of article II does not support such a restrictive reading of "claim." This paragraph provides that "[a] claim against the Company under an American policy ... shall be enforceable by the policyholder against the Trust Fund when all of the following four conditions have been complied with and not otherwise." The first of these conditions requires a claimant to obtain a judgment, the second requires the judgment to become "final," and the third requires the claimant to file the judgment with the trustee. After satisfaction of the

12. At this point the court remains uncertain whether it has discretion to award or not to award interest from the interpleaded fund, *cf. Ambromovage v. United Mine Workers of America*, 726 F.2d 972, 980–984 (3d Cir.1984), or whether Pa.R.Civ.P. 3147 (Purdon 1975) dictates or precludes an award of interest from the interpleaded fund. The court does note that as a practical matter an award of interest to either Horizon or Brown will entail a reduction of Pak-Mor's share of the interpleaded fund even though Pak-Mor has had little or no role in delaying Brown or Horizon's recovery.

If the parties are entitled to interest on their state court judgments, and if Pennsylvania standards apply to this award of federal pre-judgment (but state post-judgment) interest, the claimants may recover interest at the lawful rate of the state whose law governs the underlying obligation, the state rendering the original judgment. *East Coast Management, Inc. v. McLaughlin*, 533 F.Supp. 439, 444 (E.D.Pa.1982); *see also* 42 Pa. Cons.Stat.Ann. § 8101 (Purdon 1982). The New York judgments draw interest at nine percent per annum from the date of their docketing. N.Y.Civ.Prac.Law §§ 5003, 5004 (McKinney 1963 and Supp.1983). The Texas judgments recite that they draw interest at nine percent per annum as well.

fourth requirement—a thirty-day wait—"the said *judgment* shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hand...." Trust Agreement, art. II, ¶ 2 (emphasis added). Under this paragraph, when a "claim" becomes enforceable, the trustee pays the entire judgment.

Reading further, one finds that Commonwealth may waive any or all of the conditions and require the trustee to pay a "claim." The Trust Agreement could not have authorized the trustee to pay a "judgment" in this instance, because Commonwealth could waive the first condition; Commonwealth could direct the trustee to pay a claim not yet reduced to a judgment. Nevertheless, this paragraph appears to equate enforceable claims with judgments. When a "claim" becomes enforceable, the trustee satisfies the "judgment," not just the "claim," out of the Trust Fund. I therefore conclude that Brown may recover from Trust assets the full amount of its Texas judgment exclusive of Texas post-judgment interest.[13] By the same logic, Horizon and Pak-Mor may also recover the full amount of their judgments, if the amount of the fund permits.

## IV. CONCLUSION

The resolution of the pending motions in this matter has allowed the court to reduce to four the number of claimants who will recover from the interpleaded fund. Mamiye, Horizon, Brown, and Pak-Mor will each have some recovery. All other claimants will have no recovery from the interpleaded fund. In addition, resolution of the pending motions has permitted the court to determine that Horizon will recover no less than $83,080 and that Brown will recover no less than $117,066.02. The court has not yet determined whether these claimants may recover interest on their state court judgments in addition to the face amounts of their judgments.

A material issue of fact precludes immediate division of the entire interpleaded fund among the four successful claimants. Mamiye may recover, but Mamiye may not recover from any of the interpleaded fund impressed with Commonwealth's Trust. The present record does not disclose the value of non-Trust assets presently in the court's registry, although the Trust assets certainly exceed the combined amounts of Brown and Horizon's judgments, $200,146.02. Accordingly, resolution of the interpleaded claims will require further proceedings on the allocation question. Further, distribution to Mamiye, and hence to Pak-Mor, must await resolution of the New York proceedings involving Mamiye's judgment. These enforced delays allow the court conveniently to hold the interest issue under advisement.

The motions addressed by this memorandum do not deal with the counter-claims by Horizon and Jackson against Fidelity. Therefore, the results reached today do not justify dismissal of Jackson as a party.

An Order disposing of the pending motions follows.

## APPENDIX

### TRUST AGREEMENT

between

COMMONWEALTH MARINE & GENERAL ASSURANCE CO., LTD.

and

THE FIDELITY BANK

THIS AGREEMENT, Made as of this day of , One Thousand Nine Hundred and Seventy-Nine, By and Between COMMONWEALTH MARINE & GENER-

13. Brown, of course, perfected a claim under the Trust Agreement after he first served a writ of execution upon Fidelity. I read "claim" to mean "judgment." I therefore need not inquire whether Brown's perfection under the Trust Agreement extended the scope of assets attached beyond the amount of his "claim" up to the amount of his "judgment." At the time of Brown's perfection under the Trust Agreement, Brown would have had an entitlement to satisfaction of his entire Texas judgment had this action not begun, and had Brown been the only claimant on the Fund. Horizon and Pak-Mor have also arguably perfected under the Trust Agreement.

AL ASSURANCE CO., LTD. of Belize City, Belize, C.A., organized and existing under the laws of Belize, hereinafter referred to as the "Company", and THE FIDELITY BANK of Philadelphia, a bank and trust company organized under the laws of the Commonwealth of Pennsylvania, a member of the Federal Reserve System of the United States and having its main banking office at Broad and Walnut Streets, in the City and County of Philadelphia in the State of Pennsylvania, hereinafter referred to as the "Trustee". This Agreement supersedes all prior trust instruments executed between the above named parties.

WITNESSETH:

WHEREAS, the Company is engaged in the insurance and reinsurance business in Belize C.A. and has and will have a number of American insureds and reinsureds whose premiums, as well as potential claims, are payable in U.S.A. currency; and

WHEREAS, the Company desires to establish a Trust Fund in the United States of America as security for its American insureds and reinsureds whose claims may be payable in U.S.A. currency;

NOW, THEREFORE, the Company has paid over to or placed with the Trustee the sum of Five Hundred Thousand ($500,000.) Dollars and this sum, subject to instructions of the Company, shall at all times be maintained in cash or Certificates of Deposit of a bank member of the U.S. Federal Reserve System or in U.S. Government bonds or notes, or U.S. Government guaranteed obligations or obligations of any state of the United States. All to be held by the Trustee in trust, for the uses and purposes and upon the terms and conditions hereinafter set forth:

ARTICLE I

DEFINITION OF TERMS

The following words and phrases as used in this Trust Agreement shall, unless the context otherwise requires, have the respective meanings hereby assigned to them:

"AMERICAN POLICY" means any contract or policy of insurance or reinsurance issued or any agreement to insure made by the Company wherein the premiums and losses are expressed to be payable in U.S.A. currency.

"POLICYHOLDERS" means those policyholders of American policies who are (A) Citizens of or domiciled in the United States of America; or (B) Corporations organized under the laws of the United States of America or of any of the States, Territories or Possessions thereof; or (c) Unicorporated Associations (including Partnerships), or Corporations not within the descriptions in Subdivisions (B), the majority in interest of the beneficial interest or of the Stock of which is owned by persons or Corporations within the descriptions in Subdivisions (A) or (B) or both, and any other persons, Corporations or Associations who are holders, assignees, pledgees or mortgagees of American policies.

"CLAIM" means a claim against the Company by a policy holder for a loss under an American policy.

"TRUST FUND" means the cash or Certificates of Deposit of a bank member of the U.S. Federal Reserve System or in U.S. Government bonds or notes, or U.S. Government guaranteed obligations or obligations of any state of the United States from time to time in the hands of the Trustee hereunder constituting the principal (as distinguished from the income) of the Trust hereby created.

Words in the plural number include the singular and vice versa.

ARTICLE II

PROVISIONS RELATING TO THE TRUST

FIRST: The Trust Fund shall be exclusively available, but only as in this Agreement specifically provided, for the payment of claims under American policies, provided, however, that the Trust Fund shall also be available (in priority to the aforementioned payments) for the payment of any

and all expenses properly incurred by the Trustee in connection with the administration of the Trust.

SECOND: A claim against the Company under an American policy issued subsequent to the execution of this trust agreement shall be enforceable by the policyholder against the Trust Fund when all of the following four conditions have been complied with and not otherwise.

(A) A judgment has been obtained by the policyholder against the Company in any Court of competent jurisdiction within the United States of America in respect of the Company's liability under an American policy;

(B) Such judgment has become final in the sense that the particular litigation has been concluded either through the failure to appeal within the time permitted therefore or through the final disposition of any appeal or appeals that may be taken, the word "Appeal" being used herein to include any similar procedure for review permitted by the applicable law;

(C) A certified copy of the said judgment has been filed with the Trustee, together with such proof as to its finality and its conformance with the other condition: specified in this Article II as the Trustee shall require;

(D) A period of thirty (30) days from the date of the filing with the Trustee of the said certified copy of the said judgment and all of said proofs has expired, without such judgment having been satisfied, provided, however, that the expiration of such thirty-day period shall not be required in the event the same extends beyond the termination date of the Trust;

WHEREUPON the said judgment shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hands, without regard to the rights of any other policyholder or policyholders, provided that the Company at its option may waive any or all of the foregoing conditions mentioned in Subdivisions (A), (B), (C), and (D) hereof and direct the Trustee in writing to pay from the Trust Fund the claim of any policyholder against the Company under an American policy without such claim having become enforceable as above defined, whereupon the said claim shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hands without regard to the rights of any other policyholder or policyholders and provided further that the Trustee shall be absolutely protected in acting upon any such written direction from the Company without investigation and shall be under no obligation to see to the application of any such payment and shall not be concerned to ascertain or inquire as to the validity of such claim or the propriety of such direction.

THIRD: No holder of an American policy shall be entitled at any time to charge the Trustee in respect of any assets other than the assets actually constituting the Trust Fund at the time his claim becomes enforceable as hereinbefore defined. Nor shall any policyholder of an American policy (even after his claim becomes enforceable as hereinbefore defined) be entitled to require from the Trustee any account or otherwise to inquire into the course of the administration of the Trust or to question any act or thing done or suffered by the Trustee, or otherwise to enforce the Trust, the sole right under this Agreement of any policyholder being to receive the amount of his claim after it has become enforceable, as hereinbefore defined, from the assets then actually constituting the Trust Fund and available for such payment as provided under the Agreement.

FOURTH: Unless otherwise directed by the Company in writing, the Trustee shall retain the specific property whether consisting of cash or investments from time to time comprising the Trust Fund, except, however, that if the claim of a policyholder under an American policy should become enforceable as defined in Paragraph SECOND of Article II and there shall not then be sufficient cash in the Trust Fund with which to satisfy such claim, the Trustee shall sell such and so much of the property

then in the Trust Fund as directed in writing by the Company, or in the absence of receipt by the Trustee within the period mentioned in Subdivision (D) of Paragraph SECOND of this Article, the Trustee shall sell such and so much of the property then in the Trust Fund as in its absolute discretion it shall deem appropriate for the purpose of raising sufficient cash with which to satisfy such claim. If there shall not be sufficient property in the Trust Fund with which to satisfy such claim, the Trustee shall sell such of the assets as may be necessary.

FIFTH: The responsibility for making investments of the Trust Fund from time to time shall repose with the Company, and, unless and until otherwise requested by the Company in writing, the Trustee shall not be required to take any action in regard to investments held in the trust other than to collect the interest and dividends or other sums payable thereon. Unless otherwise requested in writing by the Company (and subject only to the provisions of Paragraph FOURTH of this Article), the Trustee shall retain any and all cash and investments held by it from time to time hereunder, notwithstanding the same may not be recognized as legal investments for trust funds under the laws of the State of Pennsylvania. The Trustee shall deposit the Trust Fund, or any part thereof, in one or more such banks or trust companies in the United States of America of the Federal Reserve System of the U.S.A. or invest same in U.S. Government bonds or notes or in U.S. Government guaranteed obligations or in obligations of any State of the U.S. *as the Company shall direct in writing,* notwithstanding the same may not be recognized by the laws of the State of Pennsylvania as legal investments for trust funds. The Trustee shall also vary any deposits and sell and dispose of any investments by and with the direction in writing of the Company. The Trustee shall be under no duty to give any investment advice to the person in connection with the Trust Fund but shall always, provided the Trustee itself shall have received actual notice thereof, notify the Company as to any rights of conversions, subscription, voting or other rights pertaining to any investments held in the Trust Fund and of any default in the payment of principal or interest. As and when directed by the Company in writing in each particular case but not otherwise, the Trustee shall exercise as specifically so directed by the Company, in respect of any property held in the Trust Fund, all the rights, powers and privileges that are or may be lawfully exercised by any person owning similar property in his own right free of the limitations imposed by any rule of law, public policy or statute with respect to the Trust Fund.

SIXTH: The Company reserves the right at its sole option to substitute or change any deposit of cash or certificate of contribution so long as said deposits or certificates of deposit are in a bank member of the Federal Reserve System of the U.S.A. and to substitute or change any U.S. Government bonds or notes or U.S. Government guaranteed obligations or obligations of any State of the U.S.A. then forming part of the Trust Fund; provided, however, that the amount of cash and the market value at the time of substitution of the investments (so substituted without regard to accrued income thereon) shall be not less than the value of the cash and/or investments withdrawn; provided further, however, that the Trustee shall be absolutely protected in relying upon any statement of the Company as to the market value of any investments withdrawn or substituted.

SEVENTH: The Trustee may hold any investments held hereunder in bearer form or in the name of a nominee or in its own name individually without the addition of any words showing its fiduciary capacity.

EIGHTH: The Trustee shall collect and receive the income from the Trust Fund, and, after deducting any expenses or other charges properly chargeable against income, shall pay over the net amount of such income upon the written order of the Company.

NINTH: The Trustee shall not out of income amortize premiums paid for investments nor make any addition to income because of the purchases of investments at a discount.

TENTH: Additional investments, cash or other assets, may be transferred or paid to the Trustee by the Company for the purposes of the Trust Fund. The Trustee shall be under no duty or obligation to require the Company to make any such transfers or payments and it shall be conclusively presumed that any and all such transfers or payments to the Trustee have been properly made.

ELEVENTH: The Trust hereby created shall commence as of the day of , 1979, and remain in force and effect to and including the day of , 19 , unless sooner terminated in the manner hereinafter provided. This Agreement and the Trust created hereunder may be sooner terminated upon the Company's becoming qualified and being licensed to do an insurance and/or reinsurance business in any State, Commonwealth or District of the United States of America. In the event of such termination, the Trustee shall appoint a firm of certified accountants as auditors and an independent audit shall be made of the Trust Fund as of the date of such termination and included in said audit an estimate shall be made by such independent auditors of the outstanding liability, if any, of the Company for incurred and unpaid losses on American policies issued by the Company to policyholders during the term of the Trust and up to and including the date the Company shall become licensed to do business in a State or States of the United States. The auditors shall upon the completion of such audit and from time to time thereafter, at the request of the Trustee, issue a certificate to the Trustee certifying the amount of any such outstanding liability at the date of such termination or at a later date specified in such certificate. The Trustee shall be protected in acting or relying upon any certificate of said auditors and shall retain such assets in the Trust Fund as may be stated therein to be necessary and the Trustee shall pay or cause to be paid therefrom the amount of any such losses in the manner provided in Paragraph SECOND of this Article II. Upon the termination of the Trust, the Trustee shall transfer, pay over and deliver to the Company the income and principal of the Trust Fund then in its hands, or the balance thereof then remaining if losses are to be paid according to the certificate of the auditors, and such payment, transfer and delivery shall constitute a full and sufficient discharge and acquittance to the Trustee in respect thereof.

## ARTICLE III

## PROVISIONS RELATING TO THE TRUSTEE

FIRST: The Trustee shall be liable only for the safekeeping and administration of the Trust Fund in accordance with the provisions of this Trust Agreement and any amendments and supplements thereto and the duties and responsibilities of the Trustee hereunder shall be determined solely by the express provisions of this Trust Agreement and no other or further duties or responsibilities shall be implied and the Trustee shall not be liable nor responsible for any loss to the Trust Fund unless the same be caused by its gross negligence or willful malfeasance.

SECOND: The Trustee shall be protected in acting upon any statement, notice, resolution, request, consent, order, certificate, report, appraisal, opinion, telegram, cablegram, radiogram, letter, or other paper or document believed by the Trustee to be genuine and to have been signed, sent or presented by the proper party or parties.

THIRD: Whenever in the administration of the Trust created by this Trust Agreement, the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and es-

tablished by a statement or certificate purported to be signed by or on behalf of the Company and delivered to the Trustee and said certificate shall be full warrant to the Trustee for any action taken, suffered or omitted by it on the faith thereof; but in its discretion the Trustee may in lieu thereof accept other evidence of the fact or matter or may require such other or additional evidence as to it may seem reasonable.

FOURTH: Except when otherwise expressly provided in this Trust Agreement, any statement, certificate, notice, request, consent, approval or other instrument to be delivered or furnished by the Company shall be sufficiently executed if executed in the name of the Company by such officer or officers of the Company or by such other agent or agents of the Company as may be designated by the Company for the time being, provided written notice of such designation by the Company shall be filed with the Trustee. The Trustee shall be protected in acting upon any written statement or other instrument made by such officer or agent of the Company with respect to the authority conferred on him.

FIFTH: The Trustee may consult with counsel selected by it and the opinion of said counsel shall be full and complete authority and protection to the Trustee in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion of said counsel.

SIXTH: The fee of the Trustee for administering the Trust created by this Trust Agreement shall be such as may be mutually agreed upon from time to time between the Company and the Trustee. The fee of the Trustee and all reasonable expenses of the Trustee and counsel fees and other disbursements incurred in and about the administration of the said Trust shall be a first lien against the Trust Fund.

SEVENTH: The Trustee shall keep full and complete records of the administration of the Trust created hereby. The Company may examine such records at any time during business hours by any person or persons duly authorized in writing by the Company.

EIGHTH: Whenever required by the Company but not oftener than semi-annually, the Trustee shall prepare and submit to the Company an account of its administration of the trust created by this Trust Agreement.

NINTH: The Trustee shall always be a bank or trust company organized under the laws of the United States or of any state thereof and shall be a member of the Federal Reserve System in the United States of America. The Trustee may resign at any time by mailing, by registered mail addressed to the Company at its last known address, or by delivery to the Company of a written notice of resignation, to take effect on the date specified in such notice, but not less than sixty (60) days after the date of mailing of such notice, or delivery thereof if it be not mailed, unless the Company shall accept as adequate shorter notice. The Trustee appointed hereunder or any successor trustee may be removed by the Company, by mailing by registered mail addressed to such Trustee at its last known address, or by actual delivery to the Trustee so to be removed, written notice of such removal, to take effect on the date specified in such notice, which said date shall not be less than sixty (60) days after the date of the mailing of such notice or the delivery thereof if it be not mailed, unless notice of shorter duration shall be accepted as adequate: provided that no such removal of the Trustee shall become effective without its consent until all sums due hereunder to the Trustee for its fee and its expenses have been paid to it. In case of the resignation or removal of the Trustee, the Trustee shall have the right to a settlement of its accounts. Upon completion of such accounting and payment to the Trustee of its fee and expenses, the Trustee shall transfer, pay and deliver to the Successor Trustee the assets comprising the Trust Fund as they may be then constituted. In case at any time the Trustee or any Successor Trustee shall resign or be removed a Successor Trustee shall be appointed by the Company. Any Successor Trustee appointed hereunder may qualify as

such by executing, acknowledging and delivering to the Company an instrument in such form as may be satisfactory to it, accepting such appointment hereunder.

ARTICLE IV

MISCELLANEOUS PROVISIONS

FIRST: In case any provision of this Trust Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the remaining parts of this Trust Agreement; and this Trust Agreement shall be construed and enforced as if such provision had never been inserted herein.

SECOND: The provisions of the validity and construction of this Trust Agreement and any amendments or supplements thereto shall be governed by and determined according to the laws of the State of Pennsylvania.

THIRD: The Company shall have the right to amend, modify, or extend in whole or in part this Trust Agreement and the Trust created thereby provided that no such amendment, modification or extension shall be effective without the written consent of the Trustee thereto. The Trustee shall have absolute and uncontrolled discretion either to give or to withhold its consent hereunder, and its decision in that respect shall be binding and conclusive upon all persons and parties, and in no event shall it incur any individual liability for any decision made by it hereunder in good faith. Such amendment, modification or extension shall be set out in an instrument in writing executed by the duly authorized representatives of the Company and the Trustee.

FOURTH: At least one year prior to expiration of the trust a decision will be made by the Company and the Trustee to renew or replace this Trust Agreement. When such decision is made, the Trustee will notify any Commissioner of Insurance of any state whose laws require such notice within thirty (30) days of such decision. If this Trust Agreement is amended, the Trustee will provide similar notice to the persons described above, under the same conditions and procedure.

FIFTH: This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute but one and the same instrument, which shall be sufficiently evidenced by any one counterpart.

SIXTH: This Trust Agreement shall be binding upon the successors and assigns of the parties hereto, present and future.

IN WITNESS WHEREOF, the Corporate Seal of the Company has been hereunto affixed pursuant to a resolution of the Board of Directors in the presence of the undersigned, being the President and the Secretary of the Company, and the Trustee has caused these presents to be executed by its Trust Officer thereunto duly authorized and its Corporate Seal to be affixed hereto.

Executed at this day of , One Thousand Nine Hundred and Seventy-Nine.

COMMONWEALTH MARINE & GENERAL ASSURANCE CO. LTD.

President

ATTEST:

Secretary

Executed at this day of , One Thousand Nine Hundred and Seventy-Nine.

THE FIDELITY BANK

President

ATTEST:

Secretary